SHIELDS v. NORFOLK AND CAROLINA RAILROAD COMPANY.

(Filed September 10, 1901.)

1. EMINENT DOMAIN—*Easements—Railroads—The Code, Sec. 1946*
—*Right-of-Way.*

   A railroad company by condemnation proceedings acquires only
   an easement in the land and a house located on the right-
   of-way does not become the property of the company.

2. RAILROADS—*Negligence—Damages—Right-of-Way—Fires.*

   A railroad company negligently setting fire to house of another
   on its right-of-way is liable for destruction of house and
   contents thereof.

ACTION by M. A. and F. P. Shields, executors of Jas. G.
Shields, against the Norfolk and Carolina Railroad Co.,
heard by Judge *T. A. McNeill,* at June Term, 1901, of HALI-
FAX County Superior Court. From a judgment for the
plaintiffs, the defendant appealed.

*W. A. Dunn,* for the plaintiffs.
*George Cowper,* for the defendant.

1——129

FURCHES, C. J.   This is an action for damages against defendant for burning a house and a lot of peanuts belonging to plaintiff.   The case comes to us upon the appeal of defendant, upon the following facts agreed, and judgment thereon for the plaintiffs:

The following facts are admitted:

1. That James G. Shields, the testator of the plaintiffs, at the time of the condemnation of the right-of-way of the defendant, was the owner of a large farm over which the right-of-way aforesaid was located, and the plaintiffs now own the same under the provisions of his will.

2. That at the time of the condemnation of the right-of-way, there was located thereon a common tenant-house which was then used by the testator as such, and which has since been used and occupied by the plaintiffs for the purpose of their farm until the time of the fire hereinafter mentioned.

3. That a short time before said fire the plaintiff had said house repaired at a cost of $25, which was without the knowledge or consent of the defendant, and had stored therein picked peanuts of the value of eighty dollars ($80).

4. That said house was wholly on the right-of-way.

5. That the right-of-way was acquired by the defendant by regular condemnation proceedings.

6. That in the month of December, 1898, a fire originated on the right-of-way at a point 200 yards from said house from sparks from one of its engines, and the said house and peanuts were entirely consumed.

7. That the defendant's engine was equipped with an approved and modern spark arrester which was in actual use at the time of the fire, and the engine was carefully and skillfully managed by a competent engineer.

8. That the defendant permitted dry grass and broomstraw to accumulate on its right-of-way, which was ignited by sparks from its engine by which the fire was communicated to said house.

9. That the use and occupation of said house was without the knowledge or consent of the defendant, but the defendant has never notified the plaintiffs to vacate said house or to' discontinue its use.

10. That the value of the house at the time of the fire was $40.

11. That the value of the peanuts in the house at the time of the fire in December, 1898, was $80.

12. That at the time of the fire there was dry grass and broomstraw on defendant's right-of-way between its road-bed and the house, and plaintiffs did not remove any dry grass or broomstraw from the right-of-way, though they could have done so.

And it seems to us that upon the facts agreed the judgment of the Court below must be affirmed.

The defendant contends that it being agreed that the house was on defendant's right-of-way, it was defendant's house, and it should not be made to pay for burning its own house, and, as the house belonged to defendant, plaintiff had no right to use it, and if he put peanuts in the house of defendant, and they were burnt, the defendant is not liable for their loss. For this position the defendant cites section 1946 of The Code, which provides that all persons, parties to proceedings to condemn land for railroad purposes, such persons "shall be divested and barred of all right, estate and interest in such real estate, during the corporate existence of the company aforesaid." This act seems to have been passed in 1871, and it must be admitted that it uses very strong language. But it can not be supposed that it has been entirely overlooked by the profession and the courts for thirty years. And this Court has so often, since its enactment, held that a railroad only acquired an easement upon the land under condemnation proceedings, that we must take it to have put that construction upon the Act of 1871. *Railroad v. Sturgeon,* 120 N. C., 225; *Beech v. Railroad,* 120 N. C., 498;

*Lassiter v. Railroad,* 126 N. C., 509; *Geer v. Water Co.,* 127 N. C., 349; *Blue v. Railroad,* 117 N. C., 644.

In the case of *Blue v. Railroad,* this language is used by the Court:

"The right of railway companies is, by judgment of condemnation, made subject to occupation, where, and only where, the corporation finds it necessary to take actual possession in furtherance of the ends for which the company was created  The damages are not assessed upon the idea of a proposed actual dominion, occupation and perception of the profits of the whole right-of-way by the corporation, but the calculation is based upon the principle that possession and exclusive control will be asserted only over so much of the condemned territory as may be necessary for corporate purposes, such as additional tracks, ditches and houses to be used for station-houses and section hands.  Unless the land is needed for some such use, the occupation and cultivation by the owner of the servient tenement will be disturbed only when it becomes necessary for the company to enter, in order to remove something which endangers the safety of its passengers, or which might, if undisturbed, subject the owner to liability for injury to adjacent lands or property.  *Ward v. Railroad.* 113 N. C., 566, and same case, 109 N. C., 358. The defendant company was liable if grass and other inflammable material, negligently left upon its right-of-way, was ignited by sparks from its engine, for any damage to adjacent landowners caused by the spreading of the fire.  8 Am. and Eng. Enc., 14; *Black v. Railroad,* 115 N. C., 667."

This quotation from Blue's case was approved by the Court and quoted in the opinion in *Railroad v. Sturgeon,* 120 N. C., 225.

It therefore seems to be the settled law in this State, so far as judicial construction can settle a question, that a railroad company by condemnation proceedings only acquires an easement upon the land condemned, with the right to actual

possession of so much only thereof as is necessary for the operation of its road, and to protect it against contingent damages.   It also seems to be settled by these and numerous other decisions of this Court, that it is negligence in a railroad company to allow dry grass and broomstraw to accumulate and remain on its right-of-way; and that such companies are liable to the damage resulting from fires caused by sparks from their engines, setting such dry grass and broomstraw one fire.

The facts agreed admit that dry grass and broomstraw were allowed to accumulate and remain on defendant's right-of-way, in December; that the fire which destroyed the house and peanuts was caused by a spark from defendant's engine, lighting upon and igniting said dry grass and broomstraw at a point 200 yards from the house.   This made the defendant liable for the house, and, we think, for the peanuts.   If the plaintiff had the right to use and occupy the house, as it seems he had, and his property rightfully in the house was destroyed by the negligence of the defendant, we see no reason why defendant is not also liable for the peanuts.   We are not able to distinguish the liability for the one from the other.

If the plaintiff had placed combustible matter on defendant's right-of-way and the fire had originated in that, and destroyed the plaintiff's house and peanuts, it would seem that, in that case, he could not recover; and defendant cited authorities tending to show that he could not.   But this question is not presented by the facts agreed and we do not pass upon it.

The defendant's principal contention is that the condemnation proceedings put the absolute title to the land condemned in the defendant, and it being admitted that the house was on the right-of-way, that is, on the land condemned to defendant's use, that the house was defendant's property, the same as if defendant

had bought the land on which it stood, paid for it, and had obtained a deed in fee-simple therefor. All the authorities the defendant cites to sustain this position are decisions of other States, or text-books, except *Railroad v. McCaskill,* 94 N. C., 746. But it does not seem to us that any of the cases sustain defendant's contention. Probably McCaskill's case comes nearer doing so than any authority cited, and we do not think it goes to that extent. But if it ever could have been considered authority for the position contended for by defendant, it has not been so considered since the case of *Blue v. Railroad, supra,* as that case expressly holds to the contrary and overrules McCaskill's case if it announced any such doctrine as that. And Blue's case has been expressly approved and followed by this Court since its first announcement. *Railroad v. Sturgeon,* 120 N. C., 225. The doctrine that the railroad has acquired and paid for the land and the buildings on the same by condemnation proceedings, is fully discussed in Blue's case and Sturgeon's case, where it is expressly held that this is not so; that these assessments were never intended, and, in fact, did not include the freehold value of the property condemned; that it was never expected that the roads would claim the actual possession and enjoyment of any more of said lands than were necessary for their operation and for their protection. If this is true, as we have every reason to believe it is, it would be monstrous to allow them under such titles to assume and take actual possession, and occupy all the houses within 100 feet of their road-bed and turn the occupants out. If this were so, what would become of Salisbury, through which the North Carolina Railroad runs, where many of its valuable houses stand within less than 50 feet of its road-bed, and were there many years before the road was located? Were they paid for? And are they to be occupied by the railroad and its lessees and tenants, and the owners turned out of possession? If this were so, what would become of Hickory?

What of Marshall, where there is hardly a house in the town but would belong to the railroad, including the court-house and public jail? Have these been assessed and paid for by the railroad?

The question seems to have been settled by the decisions of this Court that the railroad only acquired an easement to be used for the benefit and protection of the road in its being operated, and not as a means of acquiring property for the benefit of the corporation. And as it seems to us that it has been settled in accordance with justice, we have no disposition to disturb what has been done. The judgment will be

Affirmed.